# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

KEITH SMALL, as Representative   *
of the Estate of Caroline Small   *
and J. Alan Welch, as   *
authorized representative of   *
M.M., a minor child, & KEITH   *
SMALL, as authorized legal   * CIVIL ACTION NO. CV 212-115
representative of A.S., a minor   *
child   *
  *
    Plaintiffs,   *
  *
    vs.   *
  *
GLYNN COUNTY, GEORGIA;   *
TODD SIMPSON; and ROBERT   *
C. SASSER in their individual   *
capacities,   *
  *
    Defendants.   *

## INTRODUCTION

Caroline Small was shot by Glynn County police officers after leading them on a low-speed chase for nearly twenty minutes. Small did not stop moving until she was shot. During the course of the chase, she ran up on a curb, ran off the road multiple times, crossed the center line several times, hit a mailbox, turned in front of oncoming

cars, bumped a police car, drove onto a lawn, caused twenty civilian cars to pull off of the road, caused more than one law enforcement officer to believe she was about to hit them with her car, nearly missed hitting one officer who was on foot, and, despite being partially surrounded by police officers, one of whom stated he would shoot if she continued to move the car, put her car in gear, revved her engine, and continued to advance her car. The officers did fire shots, and she later died from her injuries.

Her family has now sued seeking money damages from the county and the officers who shot her. Very few facts are actually up for dispute. This is because the Court has had the ability, duty really, to watch and hear this tragedy from the perspective of no less than four separate dashboard cameras. Rather than flatly accept any attorney's characterization of the events, the Court has watched the videos a multitude of times.

Based on the record evidence, two conclusions are clear: Was her death necessary? No. Was it unconstitutional? No. Fundamental to the latter conclusion is the long, strong line of binding cases from

the United States Supreme Court and the Eleventh Circuit Court of Appeals that hold that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Pace v. Capobianco, 283 F.3d 1275, 1281 (11th Cir. 2002) (quoting Tennessee v. Garner, 471 U.S. 1, 11 (1985)). Moreover, the Eleventh Circuit Court of Appeals has made it clear that such officers are entitled to immunity from suit unless the law preexisting the use of deadly force "was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." Id. at 1282.

## FACTS

The United States Supreme Court recently re-emphasized that at the summary judgment stage, the judge's function is "not to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial." Tolan v. Cotton, 134 S. Ct. 1861, 1866

(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). (internal quotation marks omitted). As the high Court stressed, "Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, [as in Tolan], a court decides only the clearly-established prong of the standard." Id. With that recent pronouncement in mind, the Court has taken due care to credit contradicting evidence in favor of the Plaintiffs and draw evidentiary inferences in favor of the Plaintiffs as the nonmoving party.

In order to view the facts from the perspective of the Plaintiffs' best case, as must be done at this stage, the following facts are taken from the evidence—supported portions of the Plaintiffs' own submissions, the video evidence of the incident, and the unrefuted facts submitted in connection with the summary judgment motions. To the extent any facts are in dispute, they are viewed in the light most favorable to the Plaintiffs. Where competing

inferences are possible, based on the evidence, the Court accepts the inference that favors the Plaintiffs.

On the morning of June 18, 2010, Small was sitting in her car, a Buick, in the parking lot of the Embassy Suites Hotel at the Glynn Place Mall. Dkt. No. 1, p. 5. When a hotel employee tried to speak with Small, she looked "spacey" and was doing something with an object in her hands. Dkt. No. 1, pp. 5-6. The hotel employee called 911 and reported that Small was "doing drugs" and was "heating something up in her lap." Dkt. No. 1, p. 6.

Glynn County Police Officer Peter Farrick was dispatched to the scene. Dkt. No. 1, p. 6. The 911 dispatcher related that Small was "possibly shooting up." Farrick dep., p. 11. After Farrick arrived at the mall, he approached Small's car on foot and noticed that her engine was running and that her window was slightly lowered. Dkt. No. 1, p. 7. Small did not seem to notice Farrick as he observed her pick at and rub the surface of her seat while also reportedly looking under her armrest. Dkt. No. 1, p. 7. In Farrick's estimation, Small's behavior confirmed that she was impaired. Farrick dep., p. 21. Farrick

announced his presence and told Small to turn off the car. Dkt. No. 1, pp. 8-9. Small turned her head to Farrick. Her eyes were glassy and red. He ordered her to put her car in park and shut off the engine. Instead, she disobeyed his command and pulled away.

Farrick screamed at her to stop. He ran back to his car and radioed dispatch that "she's driving off on me." Farrick dep., pp. 25-29. As she attempted to elude Farrick, Small ran into a curb, blowing out one of her tires. Dkt. No. 1, p. 9. This did not deter her, for she continued to drive away from law enforcement. Dkt. No. 1, p. 9. Small continued to flee by driving through and around the mall parking lot while "weaving in between the lanes." Farrick dep., pp. 36-37, 39. Farrick had been the only pursuing officer for several minutes, when Glynn County Police Officer Robert Sasser arrived and joined the pursuit. Farrick dep., p. 41. Next, two more Glynn County officers—Davidson and Dixon—and Georgia State Patrol Trooper Jonathan Malone arrived and participated. Dkt. No. 1, pp. 11-12; Farrick dep., pp. 48-49. The officers had dashboard cameras that give multiple audio and video

perspectives of the chase. Four videos were available for review by the Court. The Sasser Video is identified by the Defendants as "A," the Davidson Video as "B," the Dixon Video as "C," and the Malone Video as "D."

As the chase continued in the parking lot, Dixon stated that "she's either still doing 10/60 [drugs] or doing something up under the front of her seat." Dixon Video at 11:48:01. At various points, the videos capture images of Small narrowly missing civilian motorists. E.g., Sasser Video at 11:48:28. One officer radioed to alert the other officers that Small had possibly been shooting up and to be careful of needles. Dixon dep., p. 150.

After weaving through the mall lot, Small turned onto Scranton Road and began driving away from the mall on the public roadways. Dkt. No. 1, p. 14. At about the same time, Officer Todd Simpson arrived in the vicinity of the pursuit, and he fell in behind the other pursuing police vehicles. Simpson dep., pp. 46-48. While Small was driving on Scranton Road, she swerved such that both of the wheels on the passenger side of her car were off of the road surface and on the adjacent grass. Malone Video at

7

11:50:03. Small next turned right onto Chapel Crossing Road. Dkt. No. 1, p. 14. While on Chapel Crossing Road, Small once veered into the oncoming lane of traffic, and she swerved off of the road and onto the adjacent grass multiple times. Malone Video at 11:50:30-11:52:05. Approximately twenty civilian cars pulled completely off of Chapel Crossing. It is unknown at this juncture whether she was the direct or indirect cause of their displacement. That is, it is unknown whether the drivers pulled off the road to avoid Small's swerving vehicle or whether they did so in response to the police siren activated while pursuing Small's swerving vehicle. The Court draws an inference, at this stage, that none of the twenty drivers were put in fear by Small. The Court infers that all twenty were displaced exclusively in response to the sirens.

Small next reached the intersection of Chapel Crossing and Altama Avenue, where she turned left into the Waverly Pines neighborhood. Dkt. No. 1, p. 15. The videos show Waverly Pines to be a relatively modest subdivision of small homes built fairly close to each other and close to the road. By the time that Small turned into Waverly

8

Pines, at least six law-enforcement vehicles were involved in some manner. Dkt. No. 1, pp. 14-15. Once inside Waverly Pines, Small continuously weaved and often drove for long periods on the wrong side of the road. Small also drove her car partially or wholly off the road at least thirteen times. Malone Video at 11:52:55, 11:53:03, 11:54:04, 11:55:35, 11:55:45, 11:55:51, 11:56:13, 11:56:39, 11:56:54, 11:57:11, 11:57:15, 11:57:31, and 11:57:49. During the course of the weaving, Small struck a mailbox. Dkt. No. 1, p. 16. She also ran at least three stop signs. Malone Video at 11:54:33, 11:55:29, and 11:57:03. Further, Small drove through someone's front yard. Malone Video at 11:56:39. At various times during the chase, pieces of rubber came off of Small's tires. This did not deter her, for she continued to flee.

At one point during the chase in Waverly Pines, Small had a choice of either continuing straight where no police officers were ahead or turning left on a side street where Officer Dixon was placing "stop sticks" to puncture her tires. Sasser Video at 11:56:10. Instead of continuing straight, she elected to turn left toward Dixon. Dixon

dep., pp. 156-57. Dixon was standing next to his car when, in his words, "[Small] came at me and my car. She steered her car at me." Dixon dep., p. 157. One video shows Dixon run while yelling at Small to stop. Dixon Video at 11:55:57.

At another point during the chase, Small's vehicle was headed directly at Simpson's, causing Simpson to fear that they were going to have a head-on collision. Simpson testified that he believes that this incident amounted to aggravated assault. Simpson dep., pp. 33-34; see also Sasser Video at 11:56:58; Malone Video at 11:55:36. Malone, from his view, thought she was veering away. Malone dep., p. 54-55, Malone dep., p. 54-55.

In order to end the pursuit, Malone began attempting the PIT (precision immobilization technique) maneuver. Malone dep., p. 34. Malone's first attempted PIT was unsuccessful. Malone dep., p. 34. Small continued to flee. Malone's second and third PIT attempts were, like the first, unsuccessful. Small continued to flee. Malone dep., pp. 34-35. Malone's fourth PIT attempt, which occurred after the pursuit had already lasted nineteen

minutes and three seconds, had positive results. Malone dep., Dkt. No. 2, p. 17, p. 59.

The videos capture (better than any brief ever could) the yelling, tense movements, and frantic nature of the final seconds following the PIT maneuver's push of Small onto the lawn.

The PIT caused Small's car to spin 180 degrees and onto a lawn. Simpson dep., pp. 121-22. Slightly behind Small's rear bumper was a utility pole. Sasser Video at 11:59:18. Sasser drove straight toward Small's car and stopped in front of her front bumper. Sasser dep., p. 189. Small drove forward and hit Sasser's car. Simpson dep., pp. 218-19; Sasser dep., p. 190; Sasser Video at 11:59:27. Sasser testified that he was trying to exit his car when Small hit it. Sasser dep., p. 190. No video shows that perspective—either to confirm or refute it. No testimony refutes that evidence; however, the Plaintiffs' attorneys, in their briefs, argue, without specific citation to contrary evidence, that Sasser is wrong. See Dkt. No. 65, p. 20. After Sasser was out of his car, he positioned himself in the "V" between his open door and his car. Simpson dep.,

p. 136. Once Simpson had parked his car, he ran forward and positioned himself next to Sasser. Simpson dep., pp. 137-39. While Sasser and Simpson were taking up defensive positions, Dixon parked his vehicle on the passenger side of Sasser's car. Dixon dep., pp. 96-98, 103-04. Dixon exited his vehicle, ran around the rear of Sasser's car, and positioned himself behind Malone's car. Dixon dep., p. 104.

Immediately after Small had advanced forward and struck Sasser's car, her vehicle next went backwards and jolted as it impacted the utility pole. Malone Video at 11:58:02. Malone perceived Small's car to be a weapon "because she was steadily moving back and forth." Malone dep., pp. 100-01. While Small was maneuvering her car in the space between Sasser's cruiser and the utility pole, Sasser, Simpson, and Dixon each perceived Small to be turning her steering wheel toward the gap between Sasser's and Malone's cars, that is, the area where Sasser and Simpson were standing. Simpson dep., p. 191; Dixon dep., pp. 199-200; Sasser dep., pp. 190-91. The parties dispute whether the evidence indicates whether she turned the steering wheel

all of the way to the right or slightly so. Because the
Plaintiffs claim a slight turn to the right, the Court will
accept that view. Sasser, Simpson, and Dixon each
perceived Small to be working her gear shift. Simpson dep.,
p. 191; Dixon dep., pp. 199-200; Sasser dep., pp. 190-91.
Even the Plaintiffs admit, as the video shows, that the car
did advance forward following the last PIT maneuver.
Sasser and Simpson each heard Small's engine "rev up."
Simpson dep., p. 191; Dixon dep., pp. 199-200; Sasser dep.,
pp. 190-91. Both officers in front of Small perceived that
she was about to hit them. Based on his observations,
Simpson "perceived…that [Small] was trying to come through
that hole where [he and Sasser] were." Simpson dep., p.
197. Similarly, Sasser thought that Small was "going to
come through [the gap] and crush [him] in the door." Sasser
dep., pp. 190-91.

Simpson is heard on the video stating that if Small
moves the car, he will shoot. The video shows that in the
split second before officers shot Small, her car moved
forward. Sasser Video at 11:59:43. As the Buick again

advanced, officers shot Small, causing her death. Dkt. No. 1., p. 22.

The total time that elapsed from the completion of the last PIT maneuver until the shots were fired was less than thirty seconds. (The Plaintiffs assert twenty-seven seconds in their briefs but plead seventeen seconds in their Complaint.) Because the Plaintiffs now urge the twenty-seven-second figure, and it more closely tracks the video evidence, the Court will accept the Plaintiffs' latest contention for the purposes of this Motion.

More to the point, the time between Small's last attempt to advance forward and the shooting is approximately one or two seconds.

Following Small's death, the Plaintiffs hired an expert witness who, with the help of measuring tools and computer graphics, was able to reconstruct the scene and calculate the width of the gap in relation to the width of Small's car. The expert concluded that Small could not have maneuvered into and through the gap in a single turn. However, he did conclude that Small's car was more narrow than the gap itself.

## DISCUSSION

Qualified immunity shields police officers sued individually "unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." Pace, 283 F.3d at 1282. The purpose of qualified immunity is to protect officials from the chilling effect that a fear of personal liability would instill in carrying out their duties. McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009) (citing Anderson v. Creighton, 483 U.S. 635, 638-39 (1987)).

Initially, a public official must prove he was acting within the scope of his discretionary authority at the time the allegedly wrongful acts took place. Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012). Here, no one disputes that Simpson and Sasser were exercising

discretionary authority, so the burden shifts to the Plaintiffs to show that qualified immunity does not apply. Id.

The Supreme Court has reaffirmed the well-worn two-part test a plaintiff must meet. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). First, the plaintiff must allege facts to establish that the officers violated constitutional rights. Id. at 232. Second, it must be shown that the right was clearly established. Id.[1] Notably, this inquiry is "undertaken in light of the specific context of the case, not as a broad general proposition." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting Saucier v. Katz, 533 U.S. 164, 201 (2001)). In the present case, the Plaintiffs can establish neither of the two prongs. That is, even when reviewing any disputed issues of fact in favor of the Plaintiffs, Sasser and Smith did not violate Small's Fourth Amendment rights. Furthermore, the law at the time of the incident did not clearly establish and place the officers on notice

---

[1] Pearson clarifies that federal courts have discretion in deciding which prong to address first. Pearson, 555 U.S. at 236.

16

that their actions would be unlawful. To the contrary, as discussed below, the Eleventh Circuit cases most factually similar to the present hold that no Fourth Amendment violation occurred.

A. Were Small's Constitutional Rights Violated?

The Plaintiffs allege that Simpson and Sasser violated Small's Fourth Amendment rights to be free of excessive force when they fatally shot her. Such a claim must be analyzed under the Fourth Amendment's "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 388 (1989). In turn, this analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (quoting Garner, 471 U.S. at 7-8) (internal quotation marks omitted). In examining the reasonableness of force, the Court must view the facts "from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." McCullough, 559

F.3d at 1206. Because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," their conduct "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396-97. We are not to view the use of force "from the comfort and safety of our chambers" but rather "through the eyes of the officer on the scene." Crosby v. Monroe Cnty., 394 F.3d 1328, 1333-34 (11th Cir. 2004).

To be sure, the Eleventh Circuit has had ample opportunity to review the factors concerning the reasonableness of deadly force. Three factors are key to determining whether an officer may use deadly force to stop a fleeing felony suspect, including whether the officer

> (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that [s]he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.

Vaughan v. Cox, 343 F.3d 1323, 1329-30 (11th Cir. 2003) (quoting Garner, 471 U.S. at 11-12) (internal quotation marks omitted). Again, in Lee, 284 F.3d at 1197-98, the Eleventh Circuit explained that in determining whether force utilized was excessive, the level of force should be weighed against 1) the severity of the crime, 2) the immediacy of the threat posed by the suspect, and 3) whether the suspect sought to evade or resist arrest.

Although these factors are important in assessing the reasonableness of deadly force, "in the end we must still slosh our way through the factbound morass of 'reasonableness.'" Scott v. Harris, 550 U.S. 372, 383 (2007). As the Eleventh Circuit has emphasized, at bottom, "the constitutional test for excessive force is necessarily fact specific." McCullough, 559 F.3d at 1206.

Here, even viewing the Plaintiffs' facts at their best, the evidence shows that Sasser and Simpson had an objectively reasonable belief that Small posed a threat of serious physical harm to themselves and to others.

Small ignored their commands at every turn. She willfully fled, and she did not stop until she was shot. During the course of eluding the police, she drove recklessly—running onto a curb, running off the road, driving through private yards, hitting a mailbox, crossing the center line, turning in front of oncoming cars, and bumping a police car. She put officers in fear of being hit by her car—once when she drove in the wrong lane toward an oncoming police car and again when she elected to turn her car onto a street where an officer was on foot. Even when she was partially surrounded, she never exited her vehicle or turned the engine off. To the contrary, seconds after striking a police car, the engine revved, and the car advanced yards from where two officers had taken up defensive positions.

Viewed from the leisurely and peaceful perspective that only hindsight allows, it is likely that Small may have been stuck such that she could have been successfully removed from the car and the pursuit could have ended absent the use of deadly force.

Indeed, the Plaintiffs hired an expert to recreate certain conditions, take measurements, and perform calculations. The expert concluded that Small would not have been able to maneuver her car through the police gap in one turn. In meaningful ways, this expert testimony "proves too much" so to speak. True, it proves that Small's death might not have been necessary. It proves that given time and tools, reasonable police officers might have come to a different conclusion about the threat she posed and the likelihood of her escape. But the expert had what officers on the scene, in the heat of a tense, loud, developing incident, did not: the luxury of time, the guarantee of safety, and the cushion of distance. Indeed, any expert's calculations may not be as precise if performed with a renegade Buick revving nearby. As the expert shows, "[r]econsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred." Menuel v. City of Atlanta, 25 F.3d 990, 997 (11th Cir. 1994) (quoting Plakas v. Drinski, 19 F.3d 1143, 1150 (7th Cir. 1994)).

The overwhelming tragedy attendant to the loss of human life tempts anyone to engage in wishful hindsight. But, such is simply not the standard, not the perspective. By the time deadly force was used, Small had committed more than multiple counts of reckless driving; she had struck a police car and drove in such a way that reasonable officers in her path would perceive aggravated assault had occurred. Under the circumstances, it was reasonable to perceive that Small had used her car as a deadly weapon. By revving the engine and advancing forward, the threat she posed to Simpson and Sasser was reasonably perceived as serious and immediate. The final Lee factor—she sought to evade or resist arrest—persisted until she was shot.

The Plaintiffs' attorneys have undertaken a near-Herculean job of trying to create a factual dispute or glean a competing inference that could change the outcome. These efforts run from sweeping undocumented allegations of conspiracies lodged against nonparties in positions of authority—the grand jury, the district attorney, the Governor—to unusually personal aspersions cast against opposing counsel and the Eleventh Circuit itself.

While irrelevant and undocumented allegations do not aid the Plaintiffs, the Court has been careful not to let such litigation tactics by counsel hurt the actual party Plaintiffs either.

Turning toward the operative facts Plaintiffs do attempt to dispute, their efforts are, understandably, focused on arguing that Small may not have actually committed aggravated assault. They argue that based on the videotape evidence, a jury could infer that she had no specific intent to harm anyone when she drove in the wrong lane toward Simpson, when she elected to turn left and drive in the direction where Dixon was on foot, or when she struck Sasser's car following the PIT maneuver. They argue that a jury could find that she encountered such officers only as a byproduct of her flight from other officers, that all she desired was to escape or possibly go home, and that the near misses or bare hit were just a function of an attempt to escape but were not actually intended to harm.

The Plaintiffs' argument misses the mark. What matters is not whether convictions for aggravated assaults are in order, but rather, whether officers had probable cause to

believe that Small committed these felonies. McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1246 (11th Cir. 2003) (deadly force permitted when officers had probable cause to believe the suspect had committed a felony). Probable cause exists when "the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010).

Even inferring that Small's ultimate desire was escape and viewing the videos in that light, the videos document at multiple junctures why reasonable officers would have believed that in her reckless attempt to avoid capture, she would hurt them with her car. The videos as a whole show she was determined to continue to elude police regardless of the condition of her tires or her surroundings and irrespective of the numerous nondeadly methods utilized to bring her reckless trip to a conclusion. Ruinous to the Plaintiffs' speculation that she never put anyone in fear of imminent harm and only ever drove away from police is

the footage in Sasser Video at 11:56:10. There she had a choice to continue straight on her path with no police in front of her or turn left toward Dixon who was on foot near his car. She turned toward Dixon. Again, at 11:59:30, just before she is shot, she has a choice. She could stop advancing her car and surrender to police. Instead, she chose to advance, striking Sasser's car a few seconds before she is shot. Viewing the videos in a light most favorable to the Plaintiffs, they may provide evidence that Small would not have ultimately been convicted of aggravated assault. However, the videos support an objectively reasonable conclusion that probable cause existed to believe Small was using her car as a weapon.

Forcefully made but less than understandable is the Plaintiffs' repeated invitation to the Court to pretend that the incident ended and Small's action ceased after the final PIT maneuver. Far from documenting such a surrender, the videos show Small continue to maneuver her car, back and forth, striking Sasser's car in the process. The engine can be heard revving, and the car can be seen moving back and forth multiple times. See Plumhoff v. Rickard,

134 S. Ct. 2012, 2021 (2014) (chase not over even if temporary "near standstill" occurs).

As to Small's final movements, the Plaintiffs argue that a factual dispute exists as to whether Small's steering wheel turned "all the way to the right" in the direction of the officers before she pulled forward or whether her car moved slightly to the right as she advanced. For the purposes of this Motion, the Court will infer that the videotape documents only a slight right direction as the car advanced, as argued by the Plaintiffs. Nevertheless, the facts remain as documented by the video: Small's car continued to advance forward, after the PIT, after the commands to stop, after the warning. Objectively reasonable officers would conclude that she posed a threat to, at a minimum, the officers standing a few yards away.

B. Did the Law Put the Officers on Notice That Their Conduct Would Be Clearly Unlawful?

There is an alternative and additional reason that Defendants must be granted summary judgment. Specifically, the Plaintiffs have failed to clear the second qualified immunity hurdle, for the law was not clearly established to

26

place Sasser and Simpson on notice that their conduct was clearly unlawful under the particular facts of this case.

Again, the United States Supreme Court and the Eleventh Circuit have provided ample guidance to district courts to determine whether a right is clearly established.  The "relevant, dispositive inquiry…is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Terrell, 668 F.3d at 1255 (quoting Saucier, 533 U.S. at 202).  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.  Saucier, 533 U.S. at 202.

There are three methods available to the Plaintiffs to show the contours of the right were clearly established.  First, they may bring forth a "materially similar case" decided prior to the officers' actions.  Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005).  Second, they could point to a broad, clearly established principle that controls the particular facts at hand.  Id. Third, the conduct may be so obviously unconstitutional that no prior case law need be established. Id.  The clearly established

law must come from decisions of the United States Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court. See id.

"Unless a government agent's act is so obviously wrong, in light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." Lassiter v. Ala. A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc).

In the present case, even a generous reading of the relevant cases proves the opposite of the Plaintiffs' contention. That is, rather than put Simpson and Sasser on notice that their actions were clearly unconstitutional, the cases most closely mirroring the present one hold that the use of deadly force was constitutional.

A fair time to begin would be the month before the June 2010 shooting. In May of 2010, the Eleventh Circuit summarized the Pace case as follows:

> [W]e found no violation of the Fourth Amendment when a high speed chase that followed a traffic violation ended with four police vehicles cornering the suspect's car in a cul-de-sac. The suspect had stopped his car, which faced

the curb, and was still in the vehicle. The
officers shouted to get out of the car, then,
"[w]ithin a moment of [the suspect's] car
stopping (at most, a very few seconds), [one
deputy]—from a position in front of [the
suspect's] car—fired two shots…through the
front wind shield." This Court found that
because the suspect drove recklessly, never
left his automobile, and never turned off its
engine, reasonable police officers would have
"probable cause to believe that [the car] had
become a deadly weapon with which [the suspect]
was armed." So, despite the fact that the
suspect "did not try to run over the deputies
and that [the suspect], in the cul-de-sac, did
not aim the car at the deputies," we concluded
that the suspect "would have appeared to
reasonable police officers to have been gravely
dangerous."

Penley v. Eslinger, 605 F.3d 843, 851 n.2 (11th Cir. 2010)

(alterations in original)(internal citations omitted)

(quoting Pace, 283 F.4d at 1277-82).

To distinguish such a similar, and fresh, statement of

the law by the Eleventh Circuit, the Plaintiffs point out

that not all of the facts are identical to the present

case. That is true, inevitable, and, in this case,

unhelpful to the Plaintiffs. Plaintiffs offer that Pace

involved a high-speed chase, while this one was low speed.

Nevertheless, common to both was the reckless nature of the

driver. Indeed, the words chosen by the Circuit were

"because the suspect drove *recklessly*, never left his automobile, and never turned off its engine, reasonable police officers would have 'probable cause to believe that [the car] had become a deadly weapon with which [the suspect] was armed.'" Id. (alterations in original) (emphasis added) (quoting Pace, 283 F.3d at 1281-82). Fast or slow, Small's driving was demonstrably reckless as shown on all four videos. Similar to Pace, she never left the automobile and never turned its engine off. Moreover, Small's actions were, in some respects, more aggravating than those of the Pace driver. Here, the car did move back and forth; the engine did rev.

Nor are we left to guess what result attains in a slow-speed chase. Robinson v. Arrugueta, 415 F.3d 1252 (11th Cir. 2005), did involve a slow-moving car, this one driven by a suspect in an undercover drug deal. The suspect returned to his car after federal agents attempted to arrest him. Id. at 1254. Agents converged around the vehicle. Id. The suspect ignored one agent's request to show his hands. Id. Instead, the suspect grinned and began moving the car in the direction of the agent at a slow rate

of speed of one to two miles per hour.  Id. If the agent had remained stationary, he would have been hit by the driver in a few seconds. Id. The agent shot the suspect to death, at which point the car stopped rolling toward the agent.  Id.  The Eleventh Circuit held that no Fourth Amendment violation occurred, even though, in hindsight, the agent could have escaped unharmed by simply stepping aside. Id. at 1256.

Similarly instructive is McCullough, 559 F.3d at 1201. In McCullough, the Eleventh Circuit reversed the district court who had denied an officer's motion for summary judgment. Id. at 1208.  In finding no Fourth Amendment violation, the circuit court noted that it has "consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." Id. at 1207.

Here, seconds before shots were fired, Small struck a police car and advanced forward again.  In this regard, binding Eleventh Circuit case law currently exists and

existed at the time of this incident that "the threat of danger to be assessed is not just the threat to officers at the moment, but also to the officers and other persons if the chase went on." Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007) (quoting Pace, 283 F.3d at 1280, n.12).

The Plaintiffs critique this pronouncement by the Eleventh Circuit by stating that

> [t]his language appears in a footnote attached to a portion of the opinion related to whether an affidavit was admissible at summary judgment. Although Judge Edmondson, who authored Pace, began the footnote with the phrase, "under the law," the footnote is followed by no citations to any authority from any court in the land. Five years later, Judge Edmondson wrote the majority opinion for the panel in Long v. Slaton, 508 F.3d 576 (11th Cir. 2007). Judge Edmondson placed this phrase in the text of the opinion with a citation to Pace. Judge Edmondson may well want the law to move in the direction suggested by this phrase; but for now there is no foundation in the law for the proposition that officers can use deadly force to stop a prospective harm that may or may not occur unless, of course, the officers have probable cause to believe that the offender is a serious violent felon.

Dkt. No. 64, pp. 25-26 (internal citations omitted).

Suffice it to say two points: first, there was probable cause to believe Small committed multiple felonies including aggravated assault. Second, the officers are

charged with following the pronouncements of the Eleventh Circuit as issued by the Eleventh Circuit, without regard for counsel's puzzling critiques of that court.

Against that background of relevant and instructive cases, the Plaintiffs rely on Morton v. Kirkwood, 707 F.3d 1276 (11th Cir. 2013), and Vaughan, 343 F.3d at 1323, as the preexisting and factually similar cases that give Small and Sasser fair warning that their actions were unconstitutional. Dkt. No. 55, pp. 23-24.

Morton cannot serve as a preexisting, fair- warning case first because it did not preexist the present incident as the Plaintiffs acknowledge. Small was shot in 2010; the Morton decision issued in 2013, Morton, 707 F.3d at 276.

Moreover, even if the dates were reversed such that Morton issued in 2010 and the Small shooting occurred in 2013, Morton would not help the Plaintiffs. That is because the *material* facts in Morton, unlike in the present case, were in dispute. The Morton plaintiff was shot and paralyzed by police. Id. at 1279. The police testified that they shot him after he accelerated his car toward them. Id. To the contrary, the plaintiff testified that

33

he was coasting toward no one at one mile an hour when he
heard police tell him to stop. Id. He immediately stopped
the car, placed it in park, and raised both hands in the
air, at which time, police shot him. Id. at 1279-80.
Taking the Morton plaintiff's best case as supported by the
evidence, the police shot and paralyzed an unarmed man, who
never struck a car, committed no crime, endangered no
person, obeyed every command, shifted his car into park,
and raised his hands in surrender. Id. In the present
case, there simply is no such evidence. No one testifies
that Small shifted her car into park, no one testifies that
she raised her hands in surrender, no one testifies that
she obeyed every command, and no one testifies that her
movement consisted of coasting one mile an hour toward no
one.

For the same reasons, Vaughan fails to establish the
clear guidance to Small and Sasser that what they did was
unconstitutional. As in Morton, the parties in Vaughan
provided evidence creating fundamental disputes about what
transpired. The police said that they shot into a speeding
truck that hit their car and drove toward them. Vaughan,

343 F.3d at 1326-27. The Vaughan Plaintiff was a passenger in the truck. Id. at 1326. He swore that all he did was ride in a truck traveling ten to fifteen miles over the highway speed limit. Id. at 1327. According to his sworn testimony, the truck took no evasive maneuvers, never veered toward anyone, had a clear path with no one in front, and received no warning before shots were fired. Id. at 1330-31.

Summary Judgment was improper in Morton because the plaintiff produced evidence that he complied, surrendered, drove only in a clear path, and received no warning that shots would be fired. Morton, 707 F.3d at 1279-80, 85-86. Similarly, the Vaughan plaintiff survived summary judgment because he produced evidence that the driver maintained his lane, drove toward no one, had a clear path, and received no warning. Vaughan, 343 F.3d at 1330-31, 33-34.

In the present case, the videos and testimony offer no such conflicts. It is not lost on the Court that unlike the plaintiffs in Vaughan and Morton, Small did not survive to tender a competing affidavit. Nevertheless, the Court

is not free to speculate whether, if she had lived, she would have given sworn testimony that

- she complied with the officers' commands;

- she did not drive recklessly;

- she did not turn in the direction of an officer while trying to avoid another;

- she did not strike a police car;

- she did put her car in park;

- she refrained from revving her engine;

- she did not maneuver her car back and forth following the PIT procedure; and

- an officer did not warn of shots being fired if she continued to advance.

No such sworn testimony has been tendered. The Court must rule on the evidence that does exist—the videos, affidavits, and other sworn testimony. Here, even viewing all inferences and conflicts in the light most favorable to the Plaintiffs, objectively reasonable officers had probable cause to believe that a felony had been committed, that she posed a threat of serious harm to officers in her

path, that the use of deadly force was necessary to prevent escape, and that a warning had been given.

C.  Recent Developments.

In order to allow the Plaintiffs every opportunity to proceed with their case, this Court withheld a decision until the United States Supreme Court issued its opinion in Plumhoff, 134 S. Ct. at 2012, a case that shares some, but certainly not all, operative facts with the present one. In Plumhoff, a driver recklessly fled from police in a high-speed, multistate escape attempt. Id. at 2017. The car "came temporarily to a near standstill" after colliding with a police cruiser. Id. at 2021. The car was flush with the cruiser and partially blocked by it. Id. at 2017. Nevertheless, the driver again attempted to maneuver his car. Id. at 2021. The police fired three shots at him. Id. at 2017. He escaped, and as he drove away, the police shot him again, this time fatally. Id. at 2018. The Sixth Circuit Court of Appeals affirmed the district court's decision that the police violated the Fourth Amendment by shooting the driver. Allen v. City of West Memphis, 509 F.

App'x 388, 394 (6th Cir. 2012), *rev'd sub nom*. <u>Plumhoff v. Rickard</u>, 134 S. Ct. 2012 (2014).

In May of 2014, the United States Supreme Court reversed the Sixth Circuit and issued its unanimous opinion that no Fourth Amendment violation occurred. <u>Plumhoff</u>, 134 S. Ct. at 2024. In doing so, the high court flatly rejected the claimant's position that the chase had ended by the time the police began to shoot. <u>Id.</u> at 2021-22. Although a temporary "near standstill" occurred, the video evidence showed that the tires were still moving. <u>Id.</u> at 2021. To the extent the <u>Plumhoff</u> decision applies to this case, it bolsters the Defendants' position.

## CONCLUSION

The key question before the Court is whether the tragic shooting of Caroline Small violated the United States Constitution such that Small's representatives can recover money damages from the police and the county. After thorough consideration, it is clear that no constitutional violation occurred. Defendants are entitled to summary

judgment.[2]  Defendants' Motion is **GRANTED**, and Plaintiffs'

Motion for Partial Summary Judgment is **DENIED**.  The Clerk

of Court is directed to enter an order closing the case.


SO ORDERED, this 30TH day of September, 2014.

LISA GODBEY WOOD, CHIEF JUDGE,
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[2] Defendants are entitled to summary judgment on the state law causes of action based on official immunity.